**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **DEBBIE G. DEVER,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **Civil Action No. 7:03-CV-0262-BH(R)** |
| **v.** | § | |
| | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pursuant to the provisions of Title 28, United States Code, Section 636(c), and an *Order* of the Court in implementation thereof, subject cause has been transferred to the undersigned United States Magistrate Judge. Before the Court are *Brief for Plaintiff*, filed May 11, 2004, *Defendant's Motion for Summary Judgment*, filed July 13, 2004, and *Plaintiff's Reply Brief*, filed July 15, 2004. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned finds that the decision of the Commissioner should be **REVERSED**, and this case be **REMANDED** to the Commissioner for further proceedings.

## I. BACKGROUND[2]

*A.*    *Procedural History*

Debbie G. Dever ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Titles II and XVI of the Social Security Act. On December 11, 1997, Plaintiff filed an application for disability

---

[2] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

-1-

benefits.  (Tr. at 113-116.)  Plaintiff claimed she was disabled due to lumbar back injury and leg

pain.  (Tr. at 126.)  Plaintiff's application was denied initially and upon reconsideration.  (Tr. at 76-

82, 85-88.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (Tr.

at 89.)  A hearing, at which Plaintiff personally appeared and testified, was held on July 27, 1999.

(Tr. at 27-65.)  On April 23, 2000, an ALJ issued his decision finding Plaintiff not disabled.  (Tr.

at 68-75.)  On October 4, 2001, the Appeals Council granted Plaintiff's request for review and

remanded the case to the ALJ.  (Tr. at 102-104.)  Upon remand, the ALJ was to obtain updated

medical evidence from Plaintiff's treating physicians, evaluate Plaintiff's subjective complaints, and

give further consideration to Plaintiff's residual functional capacity, providing specific references

to the reports of Plaintiff's treating physicians, including the October 13, 1998 report by Marcom

Herren, D.O.  *Id.*

A second hearing before an ALJ was held on August 20, 2002.  (Tr. at 51-65.)  The ALJ

issued his second decision finding Plaintiff not disabled on October 25, 2002.  (Tr. at 13-20.)  The

Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in

Plaintiff's request for review did not provide a basis for changing the ALJ's decision.  (Tr. at 6-7.)

Thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. at 6.)  Plaintiff timely

appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. §

405(g) on December 19, 2003.

**B.**     ***Factual History***

**1.**     **Age, Education, and Work Experience**

At the time of the second hearing, Plaintiff was 37 years old.  (Tr. at 53.)  She had completed

twelfth grade.  *Id.*  Her past relevant work experience included work as a food server, factory

-2-

production worker, nurse's aide, and personal care attendant.  (Tr. at 16.)

      **2.**      <u>**Medical Evidence**</u>

On October 1, 1995, Plaintiff was seen in the Emergency Department at Wichita General Hospital, complaining of neck pain following an automobile accident the day before.  (Tr. at 182-84.)  An x-ray of her cervical spine was normal.  (Tr. at 184.)  Plaintiff was diagnosed with cervical strain.  (Tr. at 183.)

Plaintiff returned to the Emergency Department on January 2, 1996, following another automobile accident.  (Tr. at 177-79.)  She complained of neck and back pain.  (Tr. at 177.)  The examining physician noted some post cervical and bilateral trapezius tenderness and tender lumbar paraspinal muscles.  (Tr. at 178.)  Straight leg raises and strength were normal.  *Id.*  An x-ray showed a slight reversal of the curve of the spine suggesting muscle spasm, but was otherwise normal.  (Tr. at 179.)  Cervical and lumbar strain was diagnosed.  (Tr. at 178.)  Plaintiff returned to the hospital on January 11, 1996, complaining of neck and back pain.  (Tr. at 175-76.)  She reported that her physician had prescribed Tylenol, that she had seen a chiropractor, and that she was receiving daily physical therapy.  (Tr. at 176.)  Back strain was diagnosed and she was prescribed Motrin.  *Id.*

Plaintiff received chiropractic treatment at the Brown-Cavett Back & Neck Chiropractic clinic.  She was first seen there for neck and lower back pain on January 8, 1996.  (Tr. at 213-23.)  An EMG performed on February 9, 1996 was normal.  (Tr. at 211-12.)  Plaintiff was seen again for back pain on February 24, 1996.  (Tr. at 201-207.)  On April 11, 1996, Plaintiff returned to the clinic complaining of pain in her legs while standing, back pain, and difficulty walking.  (Tr. at 196-200.)  She next returned on February 7, 1997, complaining of chronic pain in her lower back, neck, and

hip.  (Tr. at 190-95.)  She was last seen at this clinic on February 23, 1998, for back and leg pain.

(Tr. at 188-89.)

On March 6, 1996, Plaintiff was evaluated by Sybil R. Reddick, M.D. for pain in her lower

back and in her left leg.  (Tr. at 279-80.)  Spinal exam revealed a mild decrease in flexion and

extension secondary to pain.  (Tr. at 280.)  Lateral bend and thoracic rotation to left and right were

within normal ranges.  *Id*.  Dr. Reddick noted that the paraspinal musculature in the lumbar region

was tender to palpation.  *Id.*  Straight leg raises were equivocal on both sides, positive at 70 degrees

on the right and 60 degrees on the left.  *Id.*  Plaintiff had good range of motion of her lower

extremities bilaterally.  *Id.*  Her reflexes were +2 bilaterally and her muscle strength was normal.

*Id.*  Dr. Reddick opined that Plaintiff had lumbar strain and she was given a trigger point injection

and prescribed Daypro and Skelaxin.  *Id*.

Plaintiff returned for follow up on March 27, 1996.  (Tr. at 278.)  She reported that her pain

had decreased.  *Id.*  She was given two trigger point injections and instructed to continue the

prescribed medications.  *Id.*  At a visit on April 10, 1996, Plaintiff complained of continued lower

back pain.  (Tr. at 277.)  Although Dr. Reddick did not find further trigger point activity, and straight

leg raises were negative, Plaintiff's muscle tone was moderately increased in the lumbar muscles.

*Id.*  Dr. Reddick scheduled Plaintiff for a repeat lumbar EMG to rule out lumbar radiculopathy.  *Id.*

An EMG was performed on April 16, 1996, and was abnormal, "showing acute radicular process

involving the left L5 nerve root."  (Tr. at 275-76.)  There was no evidence of peripheral neuropathy

or myopathic process.  *Id.*  At a follow-up visit, Dr. Reddick diagnosed lumbar radiculopathy and

referred Plaintiff for a lumbar epidural steroid injection ("ESI").  (Tr. at 274.)

On May 1, 1996, Plaintiff was seen by Marcom E. Herren, D.O., for a lumbar ESI.  (Tr. at

273.)  Physical examination showed acute pain with palpation through the lumbar paraspinal musculature, ambulation with a stiffened leg, and poor toleration of any type of straight leg raise exam.  *Id.*  Due to pain, Plaintiff was unable to tolerate the injection and it was rescheduled.  *Id.*  Dr. Herren administered a lumbar ESI on June 7, 1996, noting that Plaintiff had significant tenderness upon palpation through the lumbar paraspinal musculature and significant pain in her left lower extremity.  (Tr. at 272.)

At a visit to Dr. Reddick on June 20, 1996, Plaintiff reported that she had noticed some decrease in the severity of her pain subsequent to the ESI, but that she still had some radiating pain in the left lower extremity.  (Tr. at 271.)  Dr. Reddick noted mild tenderness upon palpation in the lumbar paraspinal musculature with pain in the left lower extremity.  *Id.*  Straight leg raise exam was positive.  *Id.*  As Plaintiff reported no relief with Darvocet, Dr. Reddick prescribed Vicodin.  *Id.*  Additionally, Dr. Reddick scheduled Plaintiff for a second lumbar ESI.  *Id.*

Dr. Herren administered a second lumbar ESI on July 2, 1996.  (Tr. at 270.)  He noted that Plaintiff had obtained relief from her symptoms for three weeks after the previous injection, but that her symptoms had returned.  *Id.*  At a follow-up visit with Dr. Reddick on July 15, 1996, Plaintiff stated she had not been afforded much relief from the second lumbar ESI.  (Tr. at 269.)  Plaintiff's left leg felt tired, but she had not experienced any "give-way weakness" or falls.  *Id.*  Examination revealed tenderness to palpation over the lumbar paraspinal musculature and positive straight leg raise exam.  *Id.*  She had good muscle strength and her gait was not antalgic.  *Id.*  Dr. Reddick scheduled Plaintiff for a third lumbar ESI.  *Id.*  Plaintiff was advised to continue taking Vicodin, Skelaxin, and Daypro.  *Id.*

Plaintiff returned to Dr. Herren on July 30, 1996, for a third lumbar ESI, and she complained

of minimal relief from the July 2, 1996 ESI.  (Tr. at 268.)  Physical examination showed continued tenderness to palpation over the lumbar paraspinal musculature and positive straight leg raise exam in the left lower extremity.  *Id.*  He assessed acute lumbar radiculopathy in the L5 distribution, left lower extremity.  *Id.*  A third lumbar ESI was given.  *Id.*

Plaintiff returned to Dr. Reddick on August 12, 1996.  (Tr. at 267.)  She stated that the July 30, 1996 lumbar ESI provided relief for only one week.  *Id.*  Dr. Reddick noted tenderness to palpation over the lumbar paraspinal musculature and positive straight leg raise exam on the left lower extremity.  *Id.*  Muscle strength in the extremities was good bilaterally.  *Id.*  Dr. Reddick diagnosed acute lumbar radiculopathy, L5 distribution with left lower extremity involvement.  *Id.* Noting that lumbar ESI provided Plaintiff with very short-term relief, Dr. Reddick opined that Plaintiff would benefit from an aggressive therapy program.  *Id.*  Plaintiff was advised to increase her Vicodin dosage and to change muscle relaxants from Skelaxin to Soma.  *Id.*

On August 22, 1996, Plaintiff was seen for an orthopedic evaluation by Arthur L. Sarris, M.D., F.A.C.S.  (Tr. at 162-64.)  Physical examination revealed that Plaintiff favored the left leg when walking.  (Tr. at 163.)  She had difficulty getting on her toes and heels due to pain, weakness, and sensory disturbance in the left leg.  *Id.*  Straight leg raise exam produced pain bilaterally.  *Id.* The left Achilles and left posterior reflexes were markedly fatigued and diminished, but patella reflexes were equal.  *Id.*  Plaintiff had dermatome sensory disturbances involving the L5/S1 dermatome pattern on the left.  *Id.*  She had pain and tenderness on direct palpation in the lower lumbar and sciatic notch areas.  *Id.*  Dr. Sarris noted restriction to forward, backward, and lateral bending.  *Id.*  Dr. Sarris requested an MRI prior to making specific recommendations.  (Tr. at 164.) However, he opined that Plaintiff should not work at that time.  *Id.*

An MRI was performed on September 4, 1996.  (Tr. at 161.)  The study showed satisfactory lumbar alignment, no evidence of central bulging or herniation of any lumbar intervertebral disc, no evidence of central spinal or foraminal narrowing, and 1-2 mm of right-sided intraforaminal bulging of the L5-S1 disc without significant compromise or effacement of the right L5 nerve root. *Id.*  After reviewing the MRI, Dr. Sarris opined that Plaintiff did not need surgery and he recommended a pain clinic program.  (Tr. at 160.)

Dr. Reddick examined Plaintiff again on September 9, 1996.  (Tr. at 265.)  She noted that Plaintiff continued to complain of significant pain in her lumbar region with radiation into the left lower extremity.  *Id.*  Plaintiff had obtained some relief with pain medication and muscle relaxants. Examination revealed significant tenderness to palpation over the lumbar paraspinal musculature and positive straight leg raise exam.  *Id.*  Dr. Reddick again advised aggressive therapy and referred Plaintiff for electrical muscle stimulation unit, with the hope of decreasing the amount of pain medication needed to relieve Plaintiff's pain.  *Id.*  At a visit on October 8, 1996, Plaintiff stated that subsequent to using the electrical stimulation unity, her pain had decreased as had her need for pain medication.  (Tr. at 263.)  Plaintiff expressed an interest in returning to work.  *Id.*  Examination revealed decreased tenderness in the lumbar paraspinal musculature, mildly positive straight leg raise exam, and good muscle strength.  *Id.*  While still recommending aggressive therapy, Dr. Reddick released Plaintiff for a trial work period with the restriction that she not lift more than 15 pounds and not engage in frequent bending.  *Id.*

In a letter dated November 6, 1996, Dr. Reddick opined that Plaintiff would be able to return to gainful employment with an aggressive therapeutic approach, as well as a work hardening program.  (Tr. at 261.)  Dr. Reddick noted that Plaintiff was eager to return to work.  *Id.*  At an

examination on that same date, Plaintiff reported to Dr. Reddick that although she continued to obtain relief from the electrical stimulation unit, she had not returned to work because light duty was not available at her job, which required full recovery prior to her return. (Tr. at 260.) Plaintiff's medications were continued and a prescription was issued for an aggressive physical therapy program. *Id.* At a visit on December 3, 1996, Dr. Reddick noted that Plaintiff still had not begun a physical therapy program. (Tr. at 258.) Examination showed some tenderness in the lumbar paraspinal musculature, positive straight leg raise exam, and good muscle strength. *Id.* Plaintiff had overall decreased mobility in the lumbar spine, limited secondary to pain and decreased muscle flexibility. *Id.* Plaintiff reported continued relief from the electrical stimulation unit. *Id.* Her medications were continued. *Id.*

On January 6, 1997, Dr. Herren assumed care of Plaintiff as Dr. Reddick was no longer in practice in the area. (Tr. at 257.) Plaintiff complained of significant pain in the left lumbar region, radiating to the left lower extremity. *Id.* On examination, Dr. Herren noted tenderness over the sacroiliac joint on the left and sacroiliac maneuvers were positive. *Id.* Additionally, Plaintiff had significant tightness of the piriformis muscle on the left. *Id.* Dr. Herren assessed "chronic lumbar radiculopathy, L5 distribution left lower extremity" and "left sacroiliac joint dysfunction with piriformis syndrome." *Id.* Plaintiff was given a left sacroiliac joint injection, advised to perform piriformis stretching exercises, and prescribed Soma and Hydrocodone. *Id.*

At an examination on February 5, 1997, Plaintiff reported minimal relief from the left sacroiliac joint injection. (Tr. at 256.) She continued to have significant pain, but experienced moderate relief from the electrical stimulation unit. *Id.* Dr. Herren recommended Plaintiff restart chiropractic manipulation. *Id.* In addition, Dr. Herren performed osteopathic manipulation and

-8-

refilled Plaintiff's medications. *Id.* At a visit on March 10, 1997, Plaintiff reported some relief with chiropractic care, and Dr. Herren refilled her prescriptions. (Tr. at 255.) Plaintiff returned to the clinic on April 8, 1997, complaining of significant posterior pelvic pain. (Tr. at 254.) Dr. Herren noted tenderness over the sacroiliac region with sciatic involvement. *Id.* Straight leg raise exam was positive on the left. *Id.* Plaintiff was given a trigger point injection and advised to continue chiropractic treatment, medications, and electrical stimulation. *Id.*

On May 5, 1997, Plaintiff reported continued pain in the left sacroiliac region, but some improvement after the trigger point injection. (Tr. at 253.) Dr. Herren noted that Plaintiff's lumbar range of motion was significantly restricted and that there was significant tightness and pain over the sacroiliac joint. *Id.* As Plaintiff's attorneys had approved a physical therapy program, Dr. Herren recommended she add that to her existing treatment regimen. *Id.* Plaintiff was given another sacroiliac joint injection. *Id.* On June 2, 1997, Plaintiff reported improved pain symptoms after receiving the sacroiliac joint injection, but the symptoms had since recurred. (Tr. at 252.) Plaintiff's lumbar range of motion remained moderately reduced, direct tenderness was noted over the left sacroiliac joint, and trigger point activity was noted in the gluteus musculature. *Id.* Plaintiff was given a left sacroiliac joint injection and a trigger point injection. *Id.* She was to follow up with the physical therapy program. *Id.*

At a visit on July 1, 1997, Plaintiff complained that the injections lasted very short periods of time and that she continued to have pain. (Tr. at 251.) Dr. Herren found that most of Plaintiff's pain was located over the sacroiliac joint on the left. *Id.* Plaintiff continued to have trigger point activity through the lumbar erector spinae musculature. *Id.* In addition to continuing her current treatment regimen, Dr. Herren recommended evaluation for fluoroscopically-guided sacroiliac joint

injection.  *Id.*  Physical therapy would be considered after additional injection therapy was completed.  *Id.*  Dr. Herren administered three trigger point injections on July 15, 1997, and continued Plaintiff's medications.  (Tr. at 250.)

Plaintiff was examined by W. Scott Shaffer, M.D. on July 23, 1997, on referral by Dr. Herren.  (Tr. at 170-71.)  Plaintiff indicated she had pain over the left lower lumbosacral region right over the left sacroiliac joint.  (Tr. at 170.)  Direct palpation produced pain.  *Id.*  Plaintiff also had reproducible pain by Patrick maneuver on the left, suggesting persistent left sacroiliitis.  *Id.*  Dr. Shaffer administered a left sacroiliac injection under fluoroscopic control.  *Id.*

On August 20, 1997, Plaintiff returned to Dr. Herren, complaining of significant discomfort, despite the injection by Dr. Shaffer.  (Tr. at 249.)  Upon examination, Dr. Herren noted that Plaintiff had pain over the left sacroiliac joint, similar to the previous exam.  *Id.*  No lower extremity radiating symptoms were noted.  *Id.*  Plaintiff's piriformis was only mildly tender.  *Id.*  Plaintiff was to repeat the fluoroscopic sacroiliac joint injection with Dr. Shaffer and her medications were refilled.  *Id.*  At a visit on September 24, 1997, Dr. Herren noted that Plaintiff's pain was considered to be chronic in nature and that they were working for effective pain management relief.  (Tr. at 248.)

On October 22, 1997, Dr. Shaffer administered a second left sacroiliac injection under fluoroscopic control.  (Tr. at 166.)  Plaintiff reported that she had received excellent results for two weeks following the July 23, 1997 injection.  *Id.*

Plaintiff was seen by Dr. Herren on November 19, 1997.  (Tr. at 247.)  She reported experiencing pain relief from the October 22, 1997 injection lasting more than one week.  *Id.*  Examination revealed very significant tenderness over the sacroiliac region on the left.  *Id.*

-10-

Sacroiliac maneuvers remained positive but no lower extremity radiating discomfort was noted.  *Id.*
Plaintiff was advised to continue chiropractic treatment and follow-up with Dr. Shaffer, and her
medications were refilled.  *Id.*  On January 23, 1998, Plaintiff was again seen by Dr. Herren and
complained of continued pain.  (Tr. at 242.)  She had tenderness over the sacroiliac joint on the left
and trigger point activity through the superficial tissues.  *Id.*  Straight leg raise exam was negative.
*Id.*  Plaintiff's medications were refilled and she was advised to continue using a sacroiliac joint belt,
which had provided her with moderate relief.  *Id.*  On March 11, 1998, Dr. Herron administered two
trigger point injections, performed a myofascial release, refilled Plaintiff's medications, and advised
her to continue using the sacroiliac joint belt.  (Tr. at 241.)  When Plaintiff returned on May 13,
1998, Dr. Herren noted continued tenderness over the left sacroiliac joint and trigger point activity.
(Tr. at 240.)  He recommended another sacroiliac joint injection by Dr. Shaffer.  *Id.*  Additionally,
Plaintiff's medications were refilled and she was prescribed Elavil to assist with sleep and improve
her pain symptoms.  *Id.*

On May 21, 1998, Dr. Herren issued an evaluation of Plaintiff's limitations pursuant to a
referral by the Texas Rehabilitation Commission.  (Tr. at 236-38.)  Plaintiff exhibited mild
tenderness across the lumbar region and significant tenderness over the left sacroiliac joint.  (Tr. at
237.)  There was also somatic dysfunction through the lumbosacral region.  *Id.*  Straight leg raise
exam was mildly positive on the right, piriformis stretch was negative, and Patrick maneuver was
negative.  *Id.*  Deep tendon reflexes were 2+/4+ bilaterally and symmetrically.  *Id.*  Plaintiff was able
to walk in normal tandem gait and was able to walk on toes and heels effectively.  *Id.*  She could
squat and rise without difficulty.  *Id.*  An x-ray performed on May 14, 1998 was normal.  *Id.*  Dr.
Herren's assessment was left chronic sacroiliitis and possible right lower L5 distribution

-11-

radiculopathy.  (Tr. at 237-38.)  He noted that Plaintiff had significant and chronic tenderness and dysfunction about the sacroiliac joint on the left.  (Tr. at 238.)  Dr. Herren opined that Plaintiff should be able to work provided she was able to frequently change positions.  *Id.*  Specifically, he stated that she could perform sedentary work but would need an accommodation allowing her to change positions "approximately every 15-20 minutes due to inability for prolonged sitting or prolonged standing."  *Id.*

Dr. Shaffer administered another left sacroiliac joint injection on June 25, 1998.  (Tr. at 235.) The pre-operative diagnosis was flare-up of a left sacroiliac joint dysfunction and pain.  *Id.*

Plaintiff was again seen by Dr. Herren on October 13, 1998.  (Tr. at 233.)  He noted that she continued to do well overall with her sacroiliac joint discomfort and had responded well to the June 25, 1998 injection.  *Id.*  However, she had continued pain and discomfort with positive sacroiliac maneuvers on the left at the sacroiliac joint.  *Id.*  Straight leg raise exam was negative.  *Id.*  There was significant hypertonicity about the hip girdle and lumbar paraspinal region, but no trigger point activity.  *Id.*  Plaintiff's medications were continued and she was advised to schedule another sacroiliac joint injection with Dr. Shaffer.  *Id.*  Dr. Shaffer administered the injection on November 12, 1998.  (Tr. at 298.)

On January 12, 1999, Plaintiff returned to Dr. Herren, complaining of recurrence of pain after the November 12, 1998 injection.  (Tr. at 287.)  Plaintiff was advised to continue her treatment regimen and to schedule another sacroiliac joint injection.  *Id.*  The injection was given by Dr. Shaffer on January 27, 1999.  (Tr. at 297.)

Plaintiff was next seen by Dr. Herren on May 7, 1999.  (Tr. at 286.)  She stated that her discomfort had returned and worsened over the previous two to three weeks.  *Id.*  Palpation of the

lower back revealed exquisite tenderness over the left sacroiliac joint area. *Id.* There was no trigger point activity and straight leg raise exam was negative. *Id.* Patrick test was markedly positive on the left. *Id.* Deep tendon reflexes were 2+ and symmetrical in the lower extremities. *Id.* Plaintiff's medications were continued and she was advised to schedule a sacroiliac joint injection with Dr. Shaffer. *Id.* Dr. Herren also planned to discuss physical therapy at a future visit. *Id.* Plaintiff received another sacroiliac joint injection on June 10, 1999. (Tr. at 296.) At a follow-up visit on July 1, 1999, Plaintiff reported only 4 to 5 days of relief with the recent injection. (Tr. at 285.) Palpation of the lumbar spine revealed exquisite tenderness over the left S1 joint but no tenderness over the bony prominences of the lumbar spine. *Id.* Plaintiff was able to forward flex with some discomfort and there was no exacerbation of pain with rotation of the spine. *Id.* Deep tendon reflexes were 2+ and symmetrical bilaterally. Plaintiff had negative straight leg raise exam and positive Patrick maneuver on the left. *Id.* Plaintiff was to continue with her medications and was scheduled for a repeat left sacroiliac joint injection. *Id.*

Dr. Herren referred Plaintiff for a neurological evaluation and on July 19, 1999, Plaintiff was examined by Jaime C. Lim, M.D. (Tr. at 294-95.) Dr. Lim noted that Plaintiff's back showed moderately severe lumbosacral muscle spasm bilaterally. (Tr. at 295.) Additionally, Plaintiff's reflexes were normal except for reduced left ankle jerk and sensory exam showed depressed sensation to pinprick along the posterior aspect of the left lower extremity. *Id.* Dr. Lim's impression was that Plaintiff had chronic low back pain with continued symptoms. *Id.* An EMG and nerve conduction study was abnormal and showed: (1) a moderate degree of chronic lumbar radiculopathy involving the left S1 nerve root, with some chronic degenerative changes; (2) no evidence of peripheral polyneuropathy, and (3) no evidence of myopathic process. (Tr. at 301.) Dr.

-13-

Lim also referred Plaintiff for a lumbar MRI, which was normal.  (Tr. at 302.)

The record indicates that from August 10, 1999, through July 1, 2002, Plaintiff continued to receive regular treatment by Dr. Herron.  (Tr. at 292-93, 282-84, 312-45.)  Plaintiff continued to receive ESI and trigger point injections, from which she experienced temporary relief of her symptoms.  *Id.*  Despite regular treatment, Dr. Herron's treatment notes indicate that Plaintiff's symptoms continued to return.  *Id.*

On April 23, 2002, Dr. Herren wrote a letter pertaining to Plaintiff's limitations.  (Tr. at 314.)  He noted that she was diagnosed with "chronic radiculopathy with sacroiliitis with associated myofacial pain disorder of the lumbosacral and hip girdle musculature."  *Id.*  Although Plaintiff was responding well to chronic narcotic therapy, Dr. Herren opined that "[e]ven at a sedentary rate I feel that the prolonged nature of sitting or standing would impair her to the point that she would be unable to manage this type of employment."  *Id.*  He recommended that Plaintiff continue to be off work due to her medical condition.  *Id.*

### 3.   <u>Hearing Testimony</u>

After the case was remanded by the Appeals Council to the ALJ, the ALJ held a hearing on August 20, 2002.  (Tr. at 51-65.)  Plaintiff appeared personally and was represented by an attorney.  *Id.*  Plaintiff testified that she was 37 years old and had completed twelfth grade.  (Tr. at 53.)

Plaintiff testified that she was injured in a car accident and that she although she worked a little the year after the accident, she subsequently stopped working due to pain in her legs, back, and hip. (Tr. at 54-55.)  She stated that she felt pain after standing or walking for ten minutes.  (Tr. at 55.)  She experienced pain after sitting for thirty to forty-five minutes.  *Id.*  During the day she switched positions.  *Id.*

Plaintiff testified that her doctors did not recommend surgery because the nerve was damaged and surgery would not alleviate her pain. (Tr. at 56.) She was receiving three steroid injections each month and also took OxyContin, Lortab, and Baclofen. (Tr. at 56-57.) Her medications made her drowsy. (Tr. at 57-58.) They dulled the pain but did not eliminate it. (Tr. at 58.)

Plaintiff stated that she tried to do a little cleaning around the house and she did her own laundry. (Tr. at 59-60.) She rarely went grocery shopping because she couldn't walk for long periods of time. (Tr. at 60.) She attended church monthly and alternated sitting and standing while there. (Tr. at 61.)

A vocational expert ("VE") testified and stated that Plaintiff's past relevant work as a nurse's aid was semiskilled and medium in strength demand. (Tr. at 63.) Plaintiff's past relevant work as a cashier and an electronics worker was unskilled and light in strength demand. *Id.* Her past work as a cafeteria counter attendant was semiskilled and light. *Id.* The VE testified that Plaintiff did not have skills which would transfer to sedentary work. *Id.* In response to a question by the ALJ, the VE provided examples of unskilled sedentary jobs such as order clerk/food and beverage, call-out operator, and laminator I. (Tr. at 63-64.)

## C.   *ALJ's Findings*

The ALJ denied Plaintiff's application for benefits by written opinion issued on October 25, 2002. (Tr. at 13-20.) The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. (Tr. at 16.) Plaintiff last met the disability insured status requirements on March 31, 1999. (Tr. at 17.) The ALJ determined that Plaintiff's lower back pain, chronic left S1 radiculopathy, chronic and recurrent myofascial syndrome pain of the lumbosacral

and hip girdle musculature on the left, and history of left sacroiliitis constituted severe impairments. *Id.* However, the ALJ found that Plaintiff's impairments did not meet or equal the severity of any impairment in the Listings. *Id.*

Although the ALJ acknowledged that the record supported Plaintiff's complaints of pain and discomfort in her sacroiliac area and in her lumbar spine, the ALJ concluded that the record did not support a finding that her pain prohibited her from performing the full range of sedentary work activity. (Tr. at 18.) Accordingly, the ALJ concluded that Plaintiff retained the residual functional capacity perform the full range of sedentary work. *Id.* Because Plaintiff's past work required the ability to perform at least light work, the ALJ determined that she could not return to her past relevant work. *Id.* The ALJ then consulted the Medical Vocational Guidelines and concluded that they directed a conclusion that Plaintiff was not disabled. *Id.* As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. at 18-19.)

## II.  ANALYSIS

*A.*      ***Legal Standards***

**1.      Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2.     **Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not

be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is

capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may

be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert

vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir.

1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive

and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    *Issue for Review: Treating Physician's Opinion***

Plaintiff claims the ALJ erred in ignoring the opinions of her treating physician which placed

greater limitations on Plaintiff's ability to work due to her need to frequently change positions.

(Pl.'s Br. at 22.)

An ALJ is required to evaluate every medical opinion received and set forth the weight given those opinions.  20 C.F.R. § 404.1527(d); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)).

However, if good cause exists, an ALJ may give a treating physician's opinions little or no weight. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id*. at 456.  Thus, "[t]he treating physician's opinions are not conclusive."  *Id*. at 455.  "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has the sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.2d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Martinez*, 64 F.2d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

The Fifth Circuit in *Newton* held that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the

physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician.  *Newton*, 209 F.3d at 456 (citing 20 C.F.R. § 1527(d)(2)).  If the ALJ fails to consider the requisite criteria, the case must be remanded. *Locke v. Massanari*, 285 F. Supp.2d 784, 795 (S.D. Tex. 2001).

However, the Fifth Circuit expressly excluded from the scope of *Newton* cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" and cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical  bases for a contrary opinion."  *Newton*, 209 F.3d at 458.  Thus, "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, 2003 WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003).

In this case, the ALJ acknowledged that the record supported Plaintiff's complaints of pain and discomfort in her sacroiliac area and in her lumbar spine but concluded that the record did not support a finding that her pain prohibited her from performing the full range of sedentary work activity.  (Tr. at 18.)  However, the ALJ's second decision did not reference Dr. Herren's May 21, 1998 opinion that Plaintiff needed an accommodation allowing her to change positions "approximately every 15-20 minutes due to inability for prolonged sitting or prolonged standing."

(Tr. at 238.)

The Court notes that when the case was initially remanded to the ALJ for further consideration, the Appeals Council specifically noted that

> The hearing decision does not contain an adequate evaluation of the treating source opinion as noted in Exhibit 6F. Marcom Herren, D.O., the claimant's treating physician, completed a physician's statement dated October 13, 1998, in which he indicated the claimant was unable to work permanently, with supporting diagnosis provided. The hearing decision does not indicate what weight if any, was accorded to Dr. Herren's opinion regarding these limitations in determining the claimant's residual functional capacity.

(Tr. at 102.)  Upon remand, the ALJ was ordered to

> Give further consideration to the claimant's maximum residual functional capacity during the period at issue and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations  (Social Security Ruling 96-8p). In so doing, evaluate the treating and/or examining source opinions pursuant to the provisions of 20 C.F.R. 404.1527 and Social Security Rulings 96-2p and 96-5p. . . .

(Tr. at 103.)  The ALJ's second opinion failed to comply with this part of the order remanding the case or to discuss Dr. Herren's April 23, 2002 opinion that "[e]ven at a sedentary rate I feel that the prolonged nature of sitting or standing would impair her to the point that she would be unable to manage this type of employment."  (Tr. at 314.)

Based on the record, the Court cannot determine whether the ALJ discounted Dr. Herren's opinions or merely overlooked them when assessing Plaintiff's RFC.  If the ALJ determined that Dr. Herren's opinions as to Plaintiff's need to change positions were entitled to no weight, the ALJ was required to perform the analysis set forth in 20 C.F.R. § 404.1527(d)(2).  *See Newton*, 209 F.3d at 456.  Because the ALJ found Plaintiff to be less severely limited than did Dr. Herren, the failure to reference Dr. Herren's opinions with respect to Plaintiff's need to change

positions was erroneous.  Because the ALJ's opinion does not set forth any consideration of the *Newton* criteria, the case must be remanded.  *Locke*, 285 F. Supp.2d at 795.

Furthermore, the Court notes that the failure to reference her treating physician's opinions prejudiced Plaintiff.  *See Morris*, 864 F.2d at 335 (error does not require remand if Plaintiff was not prejudiced).  In this case, the ALJ relied upon the Grids in concluding that Plaintiff was not disabled under the Act.  The ALJ may rely on the Grids to determine whether there is other work in the economy that the claimant can perform if a claimant's impairments are solely exertional, or her nonexertional impairments do not sufficiently affect her residual functional capacity.  *Newton*, 209 F. 3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  If the claimant has nonexertional impairments or a combination of exertional and nonexertional impairments, then the ALJ must rely on a vocational expert to show that such other work exists.  *Id*.

The ALJ's second decision does not recite consideration to the claimant's maximum residual functional capacity based evaluation of the treating and/or examining source opinions during the period at issue and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations as required by the remand order.  Had the ALJ considered Dr. Herren's opinion and found that Plaintiff's RFC was further limited by the need to have a sit/stand option, he would have been required to utilize the testimony of a vocational expert rather than rely upon the Grids.  *See Scott v. Shalala*, 30 F.3d 33, 34-35 (5th Cir. 1994) (finding that the plaintiff's exertional capabilities, which required alternating between sitting and standing, did not fit within the definition of sedentary work and therefore the Commissioner could not rely upon the Grids).

For these reasons, the failure to reference the opinions of Dr. Herren casts doubt on the existence of substantial evidence to support the ALJ's decision regarding the effect of Plaintiff's

need to change position on her ability to work. *Morris*, 864 F.2d at 335. Because the ALJ erred in failing to reference the opinions of Dr. Herren, and such error casts doubt on the existence of substantial evidence to support the ALJ's determination at step five that Plaintiff retained the RFC to perform a full range of sedentary work, the Court cannot conclude that substantial evidence supports the ALJ's determination. Therefore, the Court finds that remand is required to allow the Commissioner to make a new determination as to Plaintiff's RFC.

### III.   CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **REVERSED** and the case is hereby **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings. Furthermore, on remand, the Commissioner should begin the disability analysis at step five of the sequential five-step disability inquiry and, in assessing Plaintiff's residual functional capacity, the Commissioner should set forth the weight to be given to the opinions of Plaintiff's treating physician, in accordance with the regulatory criteria. It is therefore

**ORDERED** that the *Defendant's Motion for Summary Judgment* is **DENIED**. It is further

**ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED**.

**SO ORDERED**, on this the 12th day of January, 2006.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE